(Nos. 63997, 64008, 64034 cons.—Appellate

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES HARRIS, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EARNEST WILSON, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRED COLLINS, Appellant.

*Opinion filed June 20, 1988.*

116

120

Joseph C. Polito, of Kozlowski, Polito & Feeley, of Joliet, for appellant Charles Harris.

Block, Krockey, Cernugel & Cowgill, P.C., of Joliet (Joseph M. Cernugel, of counsel), for appellant Earnest Wilson, and Earnest Wilson, of Joliet, appellant *pro se*.

Robert Agostinelli, Deputy Defender, of the Office of the State Appellate Defender, of Ottawa (Pamela A. Peters, of counsel), for appellant Fred Collins.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Terence M. Madsen, Sally L. Dilgart and Gary Schwartz, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendants Charles Harris, Earnest Wilson, and Fred Collins were convicted of murder and conspiracy to commit murder after a joint jury trial in the circuit court of Will County. Following a bifurcated sentencing hearing,

the jury found the defendants eligible for the death penalty, but found mitigating factors sufficient to preclude the imposition of death. The trial court subsequently sentenced the defendants to imprisonment for natural life on their murder convictions. No sentences were imposed on their conspiracy convictions. Following the denial of their post-trial motions, the defendants appealed their convictions to the appellate court. On appeal, the appellate court, in an unpublished Rule 23 order (143 Ill. App. 3d 1163 (unpublished order under Supreme Court Rule 23)), affirmed the defendants' convictions and sentences for murder and vacated their convictions for conspiracy. The State has not contested the vacation of the convictions for conspiracy, and this matter is not before us. We allowed the defendants' petitions for leave to appeal under Rule 315 (107 Ill. 2d R. 315), and consolidated their causes.

The defendants in the instant case, as well as the victim, George Bailey, all resided in Unit B—West at Stateville prison on January 29, 1981, when the offense was committed. The facts adduced at trial established that the killing of inmate Bailey resulted from prison gang rivalry, specifically between the Black Gangster Disciples and the Black Disciples. The victim was a member of the Black Disciples. At the time of the murder, Bailey was also a member of a small group of privileged inmates who were assigned duties of "cellhouse help." Inmates assigned to "cellhouse help" enjoyed free range of the cellhouse to the extent that, unlike all other prisoners housed in B—West, their cells were unlocked and they could roam about the cellhouse uncuffed and unescorted by a prison guard. Defendant Earnest ("Smokey") Wilson, head of the Black Gangster Disciples, disapproved of Black Disciples serving as cellhouse helpers.

Approximately two weeks prior to the January 29, 1981, murder of George Bailey, Wilson held a meeting of

inmates at his cell to "send a message" to all Black Disciple cellhouse helpers that they could either resign from their positions as cellhouse helpers or join the Black Gangster Disciples. Those in attendance at the meeting included Black Gangster Disciple members Rico Johnson, defendants Fred Collins and Charles Harris, three other Black Gangster Disciples, Franklin Murphy, Robert Watson and Charles Brooks (who were indicted along with Harris, Wilson and Collins for the murder of George Bailey, but were tried separately and convicted only of conspiracy), and three Black Disciple members, including George Bailey, who were also assigned as cellhouse help. Although two of the Black Disciples followed Wilson's suggestion and resigned their positions as cellhouse help, Bailey stayed on as cellhouse help in the B—West unit.

During the two-week period preceding the murder, the Black Disciples chanted "B. D. Power" every night around 8 p.m. Wilson expressed his dissatisfaction with this practice to Dirk Acklin, leader of the Black Disciples, but the chanting persisted. Sometime shortly after the meeting at Wilson's cell, defendant Collins was placed in segregation because he had been fighting with Bailey. Collins was returned, however, to the B—West unit as a cellhouse helper on January 29, 1981.

On the evening of January 29, 1981, Wilson met in his cell with inmates Moore, Collins, Harris, Murphy, Brooks and Watson. They smoked some marijuana and discussed the fate of George Bailey. According to James Bates, a Black Disciple housed in the cell adjoining Wilson's, Wilson announced that they should "get" Bailey. Collins said he intended to "get" him anyway. Wilson sent Harris to order Rico Johnson to distribute the gang's weapons from his cell where they were stored. At trial, Johnson testified that he gave an aluminum bat to Collins ("Bobo") and shanks to Harris ("Sundown"), "Big Crip," "Rob" and "Gator." Bates then called Bai-

ley down to his cell to report the conversation he had overheard in order to warn Bailey that he might be in danger. Bailey, however, expressed no fear, and showed Bates a shank he was carrying for protection.

Bates further testified that a unit recount was called at 9:45 p.m., requiring all inmates, including cellhouse help, to return to their cells. According to Bates, Bailey returned to his cell, talked briefly with his cellmate and, moments later, was struck from behind by a baseball bat wielded by Collins.

As the guards began to lock up the cellhouse helpers, Bates saw Collins approach Wilson's cell and signal to Wilson using gang-related gestures. He overheard Collins remark, "It's taken care of." Bates claimed that, after lock up, he saw Collins throw the bat out of his cell.

On February 5, 1981, George Bailey died. The autopsy revealed that his skull had been fractured in several places, consistent with repeated blows from a baseball bat.

As stated previously, the defendants were convicted by a jury of murder and conspiracy to commit murder, and were subsequently sentenced by the trial court to natural life imprisonment on their murder convictions. No sentences were imposed on their conspiracy convictions. The appellate court affirmed the defendants' convictions for murder and vacated their convictions for conspiracy. We granted the defendants' petitions for leave to appeal under Rule 315 (107 Ill. 2d R. 315), and consolidated their causes.

The defendants' first contention in their appeal before this court is that the trial court erred in refusing to ask certain supplemental questions proposed by their defense counsel during the *voir dire* of prospective jurors. Specifically, the defendants argue that the Will County circuit court judge who tried the instant case erred by not following the ruling set forth in the third district ap-

pellate court opinion of *People v. Zehr* (1982), 110 Ill. App. 3d 458, which held that questions tendered by defense counsel concerning the State's burden of proof, the presumption of innocence, and the defendant's right to forego testimony on his behalf, are proper subjects for the *voir dire* inquiry. At the time of the defendants' trial, the petition for leave to appeal from *Zehr* had been granted and the case was pending before our court. After the defendants' trial, we affirmed the appellate court's holding in *Zehr* (*People v. Zehr* (1984), 103 Ill. 2d 472), and, thereafter, in *People v. Britz* (1986), 112 Ill. 2d 314, we held that our earlier decision in *Zehr* was to be given prospective application only. Although the defendants are mindful of our holding in *Britz*, they nevertheless argue that since the "*Zehr* rule" was the applicable law on *voir dire* in the third district appellate court at the time of the defendants' trial, the Will County judge trying their case was bound by that decision, and his failure to apply the appellate court's holding in *Zehr* constitutes reversible error.

The State counters the defendants' argument in two ways. First, the State maintains that an appellate court decision is not binding on the trial courts, including trial courts within its own district, so long as that decision is the subject of a petition for leave to appeal which is pending in our court. The State alternatively argues that because the *Zehr* rule was given prospective application by this court in *Britz*, the defendants should not now receive *de facto* retroactivity by means of the *Zehr* appellate court opinion. The State reasons that pursuant to *Britz*, the effective date of the "*Zehr* rule" is the date of the release of the *Zehr* opinion by our court, specifically March 23, 1984 (*Zehr*, 103 Ill. 2d 472), and that since jury selection in the instant case began in May 1983, *Zehr* is therefore inapplicable.

It is fundamental in Illinois that the decisions of an appellate court are binding precedent on all circuit courts regardless of locale. (*People v. Thorpe* (1977), 52 Ill. App. 3d 576, 579.) In taking this principle one step further, it is the defendants' contention here that in those instances where two or more appellate districts are in conflict, as was the situation after the appellate court for the third district authored *Zehr*, the circuit court is bound by the decisions of the appellate court within its own district. (See, *e.g., Garcia v. Hynes & Howes Real Estate, Inc.* (1975), 29 Ill. App. 3d 479, 482.) This, then, is the basis for the defendants' argument that the trial court in the instant case was bound by the *Zehr* appellate court opinion, and erred by not applying the *Zehr* holding during the *voir dire* of prospective jurors. However, in light of our subsequent decision in *Britz*, which held the *"Zehr* rule" prospective only from the date our *Zehr* opinion was released, we hold here that these defendants were not prejudiced, and even assuming *arguendo* the trial court did err by failing to follow the appellate court's ruling in *Zehr*, this was not reversible error. To rule otherwise at this time would deprive *Britz* of all meaning and render the holding there a virtual nullity. Stated another way, if we were to apply the *Zehr* appellate court opinion prospectively at this time, we would, in essence, be applying our *Zehr* holding retroactively in violation of *Britz*. We will not do indirectly what we have refused to do directly. Further, by granting these defendants a new trial, we would be unfairly discriminating against other similarly situated defendants who were also tried within this same 18-month period between the appellate court's ruling in *Zehr* and our ruling in *Zehr*, but who happened to be tried outside the third district. We therefore reject the defendants' argument here and reaffirm our earlier deci-

sion in *Britz* which held the ruling in *Zehr* prospective only.

We additionally hold, as a matter of public policy, that the precedential effect of an appellate court opinion is not weakened by the fact that a petition for leave to appeal has been granted and is pending in that case, and trial courts are bound by that appellate court ruling until this court says otherwise. (See, *e.g., Lakeside Community Hospital v. Tahoe Regional Planning Agency* (D. Nev. 1978), 461 F. Supp. 1150; *El-Ra-Sul v. State* (Fla. App. 1984), 456 So. 2d 1244; *In re Weltman* (S.D.N.Y. 1924), 2 F.2d 759.) As Justice Learned Hand stated regarding the application of a Federal decision in which the United States Supreme Court had granted *certiorari*: "It is true that certiorari has been granted to this decree [citation], but it stands as law for me." (*In re Weltman* (S.D.N.Y. 1924), 2 F.2d 759, 760.) We suggest that in a situation where a petition for leave to appeal has been granted, trial courts, although bound to follow that appellate court opinion, should, nevertheless, apply the holding in that opinion with caution and carefully track that decision until this court has rendered its ruling on the matter.

Defendants further argue, in the alternative, that the prospective application rule of our *Zehr* holding announced in *Britz* should be reconsidered in light of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708. We find no merit to the defendants' argument because at the time *Britz* was decided this court correctly followed the applicable law on retroactivity as articulated by the United States Supreme Court in a series of cases beginning with *Linkletter v. Walker* (1965), 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731. (See, *e.g., United States v. Peltier* (1975), 422 U.S. 531, 45 L. Ed. 2d 374, 95 S. Ct. 2313; *Desist v. United States* (1968), 394 U.S. 244, 22 L. Ed. 2d 248, 89 S. Ct. 1030;

*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *Johnson v. New Jersey* (1965), 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772.) Prior to *Griffith*, it was clear that "where the Court had expressly declared a rule of criminal procedure to be a 'clear break with the past,' *Desist v. United States*, 394 U.S. at 248, it almost invariably has gone on to find such a newly minted principle nonretroactive." (*United States v. Johnson* (1982), 457 U.S. 537, 549, 73 L. Ed. 2d 202, 213, 102 S. Ct. 2579, 2587.) In the instant case, because *Zehr* had overturned a longstanding practice to which this court had not spoken, but which a nearly unanimous body of lower court authority had approved (see *People v. Phillips* (1st Dist. 1981), 99 Ill. App. 3d 362; *People v. Lowe* (5th Dist. 1975), 30 Ill. App. 3d 49; *People v. Stewart* (4th Dist. 1973), 12 Ill. App. 3d 226), it represented a "clear break" with the past. (See *United States v. Peltier* (1975), 422 U.S. 531, 45 L. Ed. 2d 374, 95 S. Ct. 2313; *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Although *Griffith* subsequently overturned the "clear break" exception, *Griffith* was *not* the law on retroactivity at the time this court decided *Britz*. We do not read *Griffith* as requiring us to reconsider our earlier holding in *Britz*.

The defendants' next argument involves the trial court's handling of alleged juror misconduct. The facts pertinent to this issue are as follows. During *voir dire* prospective juror Beverly Nilo informed the court that her brother-in-law, Ronald Fleming, was a counselor at Stateville prison. She told the court that, because of an on-going family dispute, she had not spoken to him much during the past three years and certainly not about his work.

After Nilo was accepted and sworn as a juror, but before the jury selection process was completed, the prosecutor advised the court and defense counsel that he had

learned that Fleming had been approached by defendants Wilson and Collins at the penitentiary and was asked about his relationship with juror Nilo. In light of this communication, Ronald Fleming was subjected to an *in camera* examination by the court and counsel.

At the *in camera* hearing Fleming reported that Nilo had telephoned him at home, apparently on the day after she was selected and sworn for jury service. Nilo asked Fleming whether he knew anything about a 1981 murder at Stateville. Fleming told Nilo that he knew of two murders, one in Unit C and another in Unit B—West. He recalled telling Nilo that the B—West killing was committed by "five guys with a baseball bat," and that he knew the defendants on trial. Nilo then reportedly told Fleming that she had been selected for the jury in that case and had been instructed by the judge not to discuss the case with anyone. According to Fleming, he told Nilo that she should not be talking to him. Their conversation then ceased, but not before Fleming had advised Nilo to report their conversation to the court.

Fleming further told the court that, later that same week, he was approached at the prison by defendants Collins, Wilson and Harris. Wilson asked Fleming if he knew Nilo. After Fleming acknowledged that he did, Wilson told him about some personal information Nilo had disclosed on *voir dire*. Wilson told Fleming that the defense wanted to keep Nilo as a juror, but that the State had struck her from the panel.

Thereafter, Fleming had his wife telephone Nilo to find out whether she remained on the jury. Nilo responded that she was still on the jury and that she had not told the court about her earlier communication with Fleming because she was afraid of being found in contempt of court. Fleming's wife also told Nilo that the defendants had spoken to Fleming about Nilo's participation as a juror in the case.

At the conclusion of Fleming's *in camera* interview all three defendants moved for a mistrial. The State opposed the motion, and instead moved to dismiss Nilo. Defense counsel resisted Nilo's dismissal and then moved to re-*voir dire* the jurors already selected to ascertain whether Nilo had discussed her conversation with any of them. When the trial judge expressed a willingness to discharge Nilo, defense counsel then requested that Nilo be allowed to remain on the jury. The trial court thereafter ruled that, based on the *in camera* disclosures by Fleming, the incident did not warrant a mistrial or dismissal of juror Nilo, nor a re-*voir dire* of the other jurors.

On appeal, the defendants argue that the extraneous communication between Nilo and Fleming was presumptively prejudicial, requiring further investigation, and that since no inquiry into the matter was directed to either Nilo or the other jurors, the defendants are entitled to a new trial.

It is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial. Although this presumption of prejudice is not conclusive, the burden rests upon the State to establish that such contact with the jurors was harmless to the defendant. (*Remmer v. United States* (1954), 347 U.S. 227, 229, 98 L. Ed. 654, 655, 74 S. Ct. 450, 451; see *People v. Rettig* (1972), 50 Ill. 2d 317; *People v. Buckhana* (1981), 99 Ill. App. 3d 889.) A verdict will not be set aside where it is obvious that no prejudice resulted from a communication to the jury, either by the court or by third persons outside the presence of the defendant. (*People v. Mills* (1968), 40 Ill. 2d 4.) The trial court has substantial discretion in determining whether an improper contact with a juror has caused prejudice to the defendant. See *People v. Buckhana* (1981), 99 Ill.

App. 3d 889; see also *United States v. Delaney* (8th Cir. 1984), 732 F.2d 639.

Upon our review of the record in this case we find no abuse of discretion in the trial court's refusal to discharge juror Nilo, or in its failure to conduct a further investigation into this matter by reopening the *voir dire* of either juror Nilo or the other jurors. Regarding the court's refusal to discharge Nilo, the defendants in this case cannot be permitted to assume positions on appeal wholly inconsistent with their strategy at trial. (*Cf. People v. Spears* (1986), 112 Ill. 2d 396, 405 (stating that it would be "manifestly unfair" to allow the State to create a position on appeal inconsistent with its position at trial); see also *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147.) As stated earlier, the trial judge indicated a willingness to discharge Nilo, but that proposal was staunchly rejected by defense counsel and the motion for a mistrial was withdrawn. Defense counsel appeared to take an all or nothing stand in order to retain Nilo and avoid a mistrial. Clearly, because defense counsel by their own actions contributed to the trial court's decision to deny the dismissal of juror Nilo, we decline to find any error here.

Regarding the trial court's refusal to reopen the *voir dire* of juror Nilo, while we agree that the better practice would have been for the trial court in this instance to have interviewed her again regarding her conversation with Fleming, we nevertheless fail to find that these defendants were prejudiced by the court's failure to do so. Initially, we note that during the *voir dire* of juror Nilo, she candidly revealed to the trial court her relationship with Fleming. Clearly, this is not a situation such as in *People v. Mitchell* (1984), 121 Ill. App. 3d 193, cited by the defendants, where a prospective juror lied under oath. Additionally, the trial court here had no reason to believe that the matter was not fully and frankly related

by Fleming. Both the trial court and defense counsel indicated that they believed Fleming's account of what happened and that Fleming's statements to Nilo in no way prejudiced her. Finally, the facts disclosed to Nilo through her communication with Fleming did not touch on any issue crucial to the determination of guilt or innocence. The information that the victim was killed by "five guys with a baseball bat" was essentially the same information contained in the indictment on file with the circuit clerk and was a matter of public record. Just as in the context of pretrial publicity, a potential juror need not be totally ignorant of the facts of the case. (See *People v. Silagy* (1987), 116 Ill. 2d 357; *People v. Sanchez* (1986), 115 Ill. 2d 238.) Defense counsel agreed with the trial court that a juror who obtained this same information from a newspaper article could be permitted to serve. (See *People v. Sanchez* (1986), 115 Ill. 2d 238.) In short, Nilo learned nothing more than the allegations in the indictment which were later proven beyond a reasonable doubt.

We further find no abuse of discretion in the trial court's refusal to interview the other jurors to determine whether Nilo had communicated any information to them regarding her conversation with Fleming. In contrast to *United States v. Brantley* (11th Cir. 1984), 733 F.2d 1429, cited by the defendants, there is absolutely no indication in the record that Nilo relayed the fact or substance of her extraneous conversation to the other jurors. It must be presumed that, absent a showing to the contrary, the jury followed the judge's instructions and reached a verdict based solely on the evidence placed before it. (See *People v. Silagy* (1987), 116 Ill. 2d 357.) We find no basis in the record for second-guessing the trial court's judgment on whether to risk tainting the entire jury by reopening *voir dire* on the mere speculation that Nilo's extraneous communication with Fleming might

have been relayed to the other jurors. Because the trial court was in a better position to evaluate the candor and truthfulness of Fleming, and had the opportunity to view the demeanor of juror Nilo during *voir dire*, we cannot say that the trial court abused its discretion in closing the investigation into possible juror misconduct following its interrogation with Fleming and denying the defendants' motion for a mistrial.

The defendants next argue that the trial court committed reversible error when it interfered on two occasions with the cross-examination of prosecution witness Rodriguez. The first such instance cited by the defendants occurred during the defendants' initial cross-examination of Rodriguez. Defense counsel was attempting to attack Rodriguez' credibility on grounds of bias favorable to the State resulting from an early release in exchange for Rodriguez' testimony at the defendants' trial. The following colloquy ensued:

"Q. As far as you know, Mr. Rodriguez, if you had not cooperated in this case your maximum out-date was December of 1983, wasn't it?

A. No sir.

PROSECUTOR: I object to that, sir.

THE COURT: The objection is sustained.

MR. STONE: What is the basis of the objection, Judge?

PROSECUTOR: The basis of the objection is Mr. Stone knows everyone is entitled to do half that time and get out statutorily. He is telling the witness he had to do the whole six years, giving the impression to the jury that he got something.

MR. STONE: Judge, the point that I am making is that the man got six years, and I am going to go into the fact that most of his good time was revoked for infractions that he had in the penitentiary, and but for his cooperation in this case he would have served his full time.

THE COURT: It is *pure speculation*.

MR. STONE: It is not speculation." (Emphasis added.)

The second instance of alleged interference by the trial court cited by the defendants occurred during re-cross-examination. Defense counsel attempted to impeach Rodriguez by relating Rodriguez' transfer from Stateville to Pontiac to the date Rodriguez testified before the grand jury. When Rodriguez refused to state that his transfer was approved on July 23, the day after his grand jury testimony, the court intervened and the following exchange took place:

"THE COURT: Perhaps the witness has difficulty with the form of the question, in which case you ought to restate it. It is argumentative, and the witness recognizes it as being argumentative form. He might have difficulty answering it.

CONTINUED RE-CROSS EXAMINATION BY MR. STONE:

Q. My question is simply, did you get transferred before you testified at the grand jury?

A. No comment, sir.

MR. STONE: That is my question, Judge, is that argumentative.

THE COURT: That is a different question. Do you have the date of the transfer, Mr. Stone.

MR. STONE: Yes.

THE COURT: Do you have the date?

MR. STONE: Yes. July 23.

THE COURT: What was the date of the grand jury testimony?

MR. STONE: July 22.

THE COURT: Which day comes first? Okay. Proceed.

MR. STONE: Can you instruct the witness to answer my question?

THE COURT: *He doesn't have to answer that one.*

MR. STONE: What is the basis for him not having to answer the question?

THE COURT: *Because I say you should keep going.*

MR. STONE: Judge, why don't you ask him whatever questions you want. I don't have any further questions." (Emphasis added.)

Defendants here contend that the trial court's "pure speculation" comment during defense counsel's initial cross-examination of Rodriguez, coupled with the trial court's interference with defense counsel's attempted impeachment of Rodriguez during recross regarding the date of his transfer from Stateville, impermissibly impaired their right to a fair trial. Defendants maintain that the court's comments before the jury impugned the integrity of the defense and bolstered the credibility of witness Rodriguez. We disagree.

It is well settled that the trial court has a duty not to convey improper impressions to the jury. (See *People v. Lewerenz* (1962), 24 Ill. 2d 295.) A hostile attitude toward defense counsel, an inference that defense counsel's presentation is unimportant, or a suggestion that defense counsel is attempting to present a case in an improper manner may be prejudicial and erroneous. (*People v. Marino* (1953), 414 Ill. 445, 451; see also *People v. Ferguson* (1973), 11 Ill. App. 3d 914, 917.) However, in order for a trial judge's comments to constitute reversible error, a defendant must demonstrate that the comments constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result. *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 937.

Following our review of defense counsel's entire cross-examination of Rodriguez, we find no error in the trial court's "pure speculation" comment. As the defendants here concede, after this comment was made, counsel was still able to continue the line of questioning on the matter of a "good time deal." Defense counsel sought to establish that Rodriguez had a compelling rea-

son to fabricate his claim of witnessing the attack, *i.e.*, to obtain a transfer and early release from prison through restoration of his previously revoked good-time credit as a reward for his cooperation. Rodriguez, however, repeatedly denied any such arrangement with the prosecution. During a sidebar conference, defense counsel admitted that no promise of this nature had been made by the prosecutor, and no one from the Department of Corrections had been subpoenaed to prove this point. Counsel accordingly acknowledged that he could not complete this attempted impeachment by proving a "good time deal." Clearly, the trial court was correct in its comment that any underlying motive behind Rodriguez' early release was "pure speculation." The court's comment was merely a legal ruling offered in response to the State's objection regarding the propriety of defense counsel's impeachment of Rodriguez via proof of a "good time deal." In view of the fact that defense counsel was given the opportunity to continue in his efforts to impeach this witness on a matter he knew he could not prove, we find no error in the court's "pure speculation" comment.

Regarding the second set of comments cited above by defense counsel concerning Rodriguez' transfer from Stateville on July 23, the day after his grand jury testimony, we again find no error. Defense counsel told the judge, the jury and witness Rodriguez that the date of Rodriguez' grand jury testimony was July 22, and the date of his transfer from Stateville was July 23. Keeping this in mind, defense counsel's question to the witness as to the date of his transfer was merely rhetorical. Because defense counsel in effect asked and answered his own question, the trial court's comment that Rodriguez need not answer the question amounted to no more than an attempt to move the already lengthy cross-examination along. Such efforts by the trial court during the

course of vigorously defended protracted criminal litigation are common and oftentimes necessary. Both defense counsel and the court were obviously frustrated at the witness' refusal to answer the question. We do not interpret the court's comments as a suggestion by the court that counsel's impeachment efforts were immaterial.

Finally, considering the foregoing exchanges in the context in which they were made, including the fact that at the close of all the evidence the jury was instructed that the court's rulings and remarks were not meant to indicate any opinion either on the facts or on what the verdict should be (Illinois Pattern Jury Instructions, Criminal, No. 1.01(11) (2d ed. 1981)), we conclude that neither of the comments cited above were prejudicial to the defendants or demeaning to defense counsel.

The defendants next argue that the trial court erred in admitting the grand jury testimony of Angel Rodriguez during the prosecutor's redirect examination. The first part of the defendants' two-part argument on this issue concerns the well-settled rule that a consistent statement is admissible to rebut a charge of recent fabrication. (*People v. Powell* (1973), 53 Ill. 2d 465, 474-75.) The defendants urge here that because Rodriguez' motive to fabricate predated his grand jury testimony, this testimony was inadmissible for purposes of rehabilitation.

As a general rule a witness may not be rehabilitated by admitting former statements consistent with his trial testimony. (*People v. Clark* (1972), 52 Ill. 2d 374, 389.) A narrow exception to this rule has been created where it is charged that the testimony is recently fabricated or that the witness has some motive for testifying falsely. Then a prior consistent statement may be admitted, but only if made before the motive to fabricate arose. (*People v. Powell* (1973), 53 Ill. 2d 465, 475; *People v. Clark* (1972), 52 Ill. 2d 374, 389; see *People v. Van Zile* (1977),

48 Ill. App. 3d 972; see also E. Cleary & M. Graham, Handbook of Illinois Evidence §611.14 (4th ed. 1984).) In such an instance, proof that the witness gave a similar account of the occurrence, when the motive to lie was nonexistent, or before the effect of the account could be foreseen, makes the prior consistent statement admissible. (*People v. Powell* (1973), 53 Ill. 2d 465, 475.) An illustration of this rule is demonstrated in the following hypothetical:

> "[A]ssume that John, while standing on the sidewalk, witnessed an automobile accident involving a car driven by Mary and a truck driven by Bill. The factual issue in dispute is the color of the traffic light at the intersection facing both parties. At trial, John testifie[d] that the light facing Mary was green. On cross-examination, Bill's attorney brings out that four weeks after the accident John met Mary for the first time at her lawyer's office, [and] that they dated thereafter, and that they are now engaged to be married. On redirect examination, John may testify that one day after the accident he told his best friend Tim that the light facing the car driven by the woman was green. However, John may not testify that two weeks after John and Mary were engaged he told his mother that the light facing Mary was green." E. Cleary & M. Graham, Handbook of Illinois Evidence §611.14 (4th ed. 1984).)

At trial the thrust of State witness Angel Rodriguez' testimony was that he saw defendant Collins strike Bailey with the baseball bat and then return to his cell. On cross-examination, defense counsel attempted to impeach Rodriguez through the admission of certain statements he made before the grand jury. Inquiring into whether Collins was wearing gloves at the time of the attack and whether the bat was disposed of in the back of the gallery, defense counsel proved prior inconsistent statements made by Rodriguez on these two specific points. On redirect the State was allowed to rehabilitate Rodri-

guez by introducing Rodriguez' entire grand jury testimony, which included statements consistent with his trial testimony on these two points. In arguing that the admission of Rodriguez' grand jury testimony was improper, defendants point out that Rodriguez' good-time credits were revoked before the attack on Bailey, and therefore the circumstances giving rise to the motive to fabricate, *i.e.*, to obtain an early release through restoration of that credit, occurred before his grand jury testimony. Thus, the defendants argue, since Rodriguez testified before the grand jury when his motive to fabricate existed, his testimony should not have been admitted as a prior consistent statement.

The defendants' argument here is flawed. Rodriguez repeatedly denied any "good time deal" or similar arrangement with the prosecutor to exchange his testimony for restoration of good-time credits needed for early parole. As we discussed previously, defense counsel admitted that impeachment through proof of a "good time deal" could not be accomplished. Clearly, in a situation such as this where the witness denied having made a deal with the State and there exists no independent proof of such a deal, there can be no charge of recent fabrication or inference that the witness had a motive to testify falsely. (See *People v. Van Zile* (1977), 48 Ill. App. 3d 972; see also *People v. Smith* (1985), 139 Ill. App. 3d 21.) The innuendo that a deal had been entered into by Rodriguez in exchange for the reinstatement of his good-time credits does not constitute proof of such a deal. Consequently, when defense counsel failed to prove any "good time deal," counsel also failed to establish that Rodriguez had a motive to fabricate testimony at the time he testified before the grand jury. Thus, because the defense failed to demonstrate that a motive to fabricate existed at the time Rodriguez gave his grand jury

testimony, that testimony was properly used to rehabilitate the witness.

In the second part of the defendants' two-part argument concerning the admission of the grand jury testimony, the defendants assert that the trial court erred in allowing the prosecutor to rehabilitate Rodriguez on redirect by introducing Rodriguez' *entire* grand jury testimony. In making their argument defendants point out that Rodriguez was impeached with his grand jury testimony on only two matters, specifically whether Collins was wearing gloves at the time of the attack, and whether the bat was disposed of in the back of the gallery. Because the entire grand jury testimony went beyond these limited matters, the defendants contend that the State was improperly allowed to reemphasize every detail of Rodriguez' testimony, thus bolstering his credibility.

It is well established that where a witness has been impeached by proof that he has made prior inconsistent statements, he may bring out all of the prior statements to qualify or explain the inconsistency and rehabilitate the witness. (*People v. Hicks* (1963), 28 Ill. 2d 457, 463.) We agree with the defendants that the admission into evidence of any prior statement under this rule is subject to the requirements of relevance and materiality. (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 820.) We also agree with the appellate court's assertion in *Andersch* that "a portion of a witness' statement which is not a qualification or an explanation of the apparent inconsistency in the prior impeaching statement need not be admitted on these grounds." 107 Ill. App. 3d at 820.

We find here that the trial court erred in allowing the prosecutor to read those portions of the grand jury testimony that went beyond the alleged inconsistencies in Rodriguez' testimony concerning whether Collins wore gloves and the disposal of the bat. Clearly, only Rodri-

guez' grand jury testimony qualifying or shedding light on these two matters should have been admitted. (See *People v. Cowper* (1986), 145 Ill. App. 3d 1074.) The introduction of the remaining portions of the grand jury testimony improperly bolstered Rodriguez' trial testimony. (See *People v. Allen* (1976), 36 Ill. App. 3d 821.) However, under the totality of the circumstances here, we find that any error in admitting the entire testimony was harmless. Our review of the record reveals that defense counsel was given the opportunity to extensively impeach Rodriguez' credibility through evidence of a prior conviction for murder reduced to manslaughter, disciplinary incidents in the penitentiary, the delayed reporting of the attack on Bates, alleged gang ties to the Latin Kings, and the State's assistance with the marijuana charge in exchange for testimony. Additionally, following the prosecutor's reading of the grand jury testimony, defense counsel on recross brought out the fact that Rodriguez had in fact been transferred from Stateville one day after giving his testimony before the grand jury. Thus, in light of defense counsel's extensive cross-examination and impeachment of Rodriguez' credibility in several important areas, we find it unlikely that the introduction of the entire testimony could have affected the jury's verdict. The scope of redirect examination lies within the sound discretion of the trial court, and we will not reverse the trial court's decision unless it is a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Cowper* (1986), 145 Ill. App. 3d 1074, 1083-84.) We cannot say that the trial court's decision allowing the State to read the entire transcript resulted in reversible error.

The defendants next challenge the trial court's ruling on the State's objections to certain questions directed by defense counsel during cross-examination and re-cross-examination of State witness James Bates. These ques-

tions concerned Bates' possible expectations that his good-time credit would be restored in exchange for his testimony against these defendants, and certain correspondence allegedly exchanged between Bates and Department of Corrections Director Michael Lane about a transfer out of Stateville. The defendants suggest that these restrictions on the cross-examination of Bates interfered with their constitutional right to confrontation.

The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness' bias, interest or motive to testify falsely. (See *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. (See *Greene v. McElroy* (1959), 360 U.S. 474, 3 L. Ed. 2d 1377, 79 S. Ct. 1400.) However, the sixth amendment does not prevent a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. (*Delaware v. Van Arsdall* (1986), 475 U.S. 673, 678, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435.) It is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance. (*Delaware v. Van Arsdall* (1986), 475 U.S. 673, 678, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435; see also *People v. Crosser* (1983), 117 Ill. App. 3d 24.) As the United States Supreme Court observed in *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 295, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.)

As a reviewing court, we are not required to isolate the particular limitation on cross-examination to determine whether reversible error has occurred. (*United States ex rel. Blackwell v. Franzen* (7th Cir. 1982), 688 F.2d 496, 500.) Rather, "the question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony." (*United States v. Rogers* (7th Cir. 1973), 475 F.2d 821, 827, quoting *Fountain v. United States* (5th Cir. 1967), 384 F.2d 624, 628.) In answering this question the court must look to the record as a whole and the alternative means open to the defendant to impeach the witness. (See *People v. Hines* (1981), 94 Ill. App. 3d 1041, 1048; see also *United States ex rel. Blackwell v. Franzen* (7th Cir. 1982), 688 F.2d 496, 501.) Thus, if a review of the entire record reveals that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry. *People v. Hines* (1981), 94 Ill. App. 3d 1041, 1048.

As previously stated, we are concerned in the instant case with impeachment through evidence of bias. Defense counsel sought to impeach Bates by showing his bias in two ways. First, defense counsel attempted to prove that Bates had traded his cooperation in this case for a transfer from Stateville. The defendants complain here that the trial court improperly limited cross-examination regarding his correspondence with Department of Corrections authorities over his request for a prison transfer.

The record reveals that Bates had applied for a transfer from Stateville sometime before October of 1981 because he believed his life would be in danger if he cooperated with the authorities over the murder of George Bailey. Bates admitted this information several times during cross-examination. Referring to Michael Lane, the Director of the Department of Corrections, Bates testified: "the Director told me if I was going to testify then arrangements would be made to get me out of Stateville." In a letter dated October 1981, however, Lane denied the transfer request. Because the trial judge decided that Lane's letter was inadmissible hearsay, defense counsel was unable to prove the contents of the letter. The record indicates that Lane eventually reconsidered his decision for some unknown reasons, and Bates received his requested transfer from Stateville on December 23, 1981. Bates testified that the only reason he was transferred from Stateville was to protect his life.

We agree with the trial court's decision refusing the admission of Lane's letter. After Bates admitted that the transfer was initially denied, defense counsel then sought to elicit from Bates what was in the mind of Lane when he wrote the letter denying the transfer. On appeal, the defendants maintain that Lane's written explanation was not being offered for the truth of the matter asserted, i.e., why Lane denied the transfer, but rather to establish Bates' state of mind, particularly his motive for testifying at trial. The defendants' argument is flawed, because obviously a letter written by Lane could only prove Lane's state of mind and not Bates' state of mind in agreeing to testify. Lane was not called as a witness in the defendants' trial to testify as to the contents of his letter to Bates. Unlike the situation presented in *People v. Albanese* (1984), 102 Ill. 2d 54, cited by the defendants, we do not find that the letter here

was offered for any nonhearsay purposes. Under these circumstances, the trial court's ruling sustaining the State's hearsay objection was not an abuse of discretion.

Defense counsel also attempted to impeach Bates for bias through the introduction of evidence of his previously revoked good-time credits. Specifically, the defendants assert that the trial court erred in barring the defendants' cross-examination of Bates with regard to his subjective hopes of restoration of his good-time credits in exchange for his testimony at trial.

The law is clear in Illinois that when impeaching a witness by showing bias, interest or motive the evidence used must give rise to the inference that the witness has something to gain or lose by his testimony. (*People v. Triplett* (1985), 108 Ill. 2d. 463, 475-76.) Additionally, the defendant need not show before cross-examining a witness as to the witness' possible bias that any promises of leniency have been made or any expectations of special favor exist in the mind of the witness. Moreover, defense counsel should be allowed the opportunity to inquire into such promises or expectations whether based on fact or imaginary. *Triplett*, 108 Ill. 2d at 476; *People v. Freeman* (1981), 100 Ill. App. 3d 478, 481.

Under cross-examination of Bates by defense counsel, the following exchange occurred:

"Q. Now by July of 1981, before the grand jury convened, you had lost considerable good time, hadn't you?

A. Yes.

Q. As a matter of fact, you had lost approximately two years and seven months of good time by July 22, 1981, hadn't you.

A. Yeah."

When counsel next asked about the term of Bates' initial sentence, the State objected and counsel withdrew the question without a ruling from the judge. On redirect, the State demonstrated from Bates' testimony that

the good-time credit Bates lost was never restored. In his offer of proof, defense counsel admitted he could not prove that any "deal" existed between the witness and the State. Counsel told the court he wanted to demonstrate that Bates lost a substantial amount of good-time credit in order to suggest that the witness harbored a subjective hope that those credits would be restored in exchange for testimony.

Clearly, Bates' subjective hopes of restoration of good-time credits or other leniency were relevant on cross-examination. (See *People v. Dunivant* (1981), 96 Ill. App. 3d 62.) Counsel in this case was entitled to impeach for bias with proof of promises of leniency or expectations of special favors. (*Triplett*, 108 Ill. 2d 463.) However, for whatever reason counsel never asked the witness whether he harbored any hope of receiving some benefit through the restoration of his good-time credits in exchange for his trial testimony. Such a question would certainly have been permissible. It appears from the record in this case that the trial judge mistakenly believed defense counsel could not make such an inquiry without first establishing proof of a deal. This is clearly incorrect. Nevertheless, our review of the entirety of the testimony elicited on cross-examination of Bates convinces us that prior to the prosecutor's objection defense counsel was given more than adequate latitude to establish Bates' potential bias. Moreover, defense counsel was not totally precluded from cross-examining Bates regarding the revocation of his good-time credits. Additionally, in closing argument defense counsel effectively argued that Bates' testimony was incredible. Under these circumstances, we find that any error in the court's limitation of defense counsel's inquiry into Bates' expectations of the restoration of his good-time credits for purposes of showing bias was harmless beyond a reasonable doubt. See *Delaware v. Van Arsdall* (1986), 475 U.S.

673, 89 L. Ed. 2d 674, 106 S. Ct. 1431; see also *People v. Crosser* (1983), 117 Ill. App. 3d 24.

The defendants' next assignment of error concerns the impeachment of State's witness Rico Johnson. The facts pertinent to this issue are as follows. The record reveals that Johnson reported to prison authorities in February 1981 that he had knowledge about the attack on Bailey, but he refused to divulge any information until he was granted a transfer out of Stateville. Two years later, Johnson was transferred to Sheridan Correctional Center. On March 11, 1983, he gave a statement to Department of Corrections Investigator McWilliams detailing his recollection of events surrounding the murder of Bailey. A copy of McWilliams' written report regarding Johnson's statement was furnished to the defense during pretrial discovery. It does not appear from the record that Johnson signed the report. At trial the defense attempted to impeach Johnson by pointing out two factual discrepancies between the McWilliams report and Johnson's in-court testimony. On redirect examination, however, it was revealed that Johnson's statement to McWilliams had been given orally on March 11, 1983, and was thereafter reduced to written form by McWilliams on March 28, 1983, in the investigator's own words. Johnson testified that he had told the prosecution during a pretrial interview that McWilliams' report contained certain mistakes.

Following Johnson's testimony, defense counsel moved for a mistrial on the ground that the inconsistencies anticipated by the prosecutor had not been previously disclosed. In denying the motion, the trial judge observed that disclosures of the unsworn hearsay summary, written in McWilliams' own words, could not carry any assurance that Johnson's trial testimony would be consistent with the summary. Defense counsel agreed. The trial court also found that because the factual dis-

crepancies were brought out on cross-examination, the defendants had not been prejudiced.

On appeal, the defendants argue that the prosecution's failure to supplement its pretrial discovery with Johnson's oral corrections wholly undercut defense counsel's attempted impeachment of the witness. The two inconsistent facts at issue concerned the timing of the meeting attended by Johnson, the defendants and Bailey prior to January 29, 1981, and the manner of disposing of the baseball bat used to kill Bailey. In the McWilliams statement Johnson reportedly said the meeting was held two *days* before the killing and that the bat had been hidden by defendant Harris behind a garbage can after the attack. At trial Johnson testified that the meeting had been held two *weeks* prior to the attack and that he had seen the bat thrown out on the gallery the night of the attack. Defendants contend here that the prosecutor's deliberate failure to disclose this supplemental information in discovery denied them a fair trial.

In deciding this issue we note that following the trial court's denial of the defendants' motion for a mistrial, defense counsel called Investigator McWilliams to the stand. McWilliams testified that "although it [the report] does not state that specifically," the summary prepared by him "reflect[ed]" that Johnson reported a meeting two days, rather than two weeks, before the murder. To the best of the investigator's recollection, Johnson also told McWilliams that Harris had placed the baseball bat behind the garbage can.

Supreme Court Rule 412(a)(i) (107 Ill. 2d R. 412(a)(i)) provides as follows:

> "(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel."

Supreme Court Rule 415(b) (107 Ill. 2d R. 415(b)) provides that once discovery has been conducted, any *additional* material or information acquired by either the defendant or the State which is subject to disclosure shall be promptly disclosed.

We find here that the State's failure to advise the defendants that Johnson had repudiated portions of McWilliams' report prior to trial constituted a violation of Supreme Court Rules 412(a)(i) and 415(b). Clearly Supreme Court Rules 412 and 415 require a prosecutor to disclose to the defendant any errors in documents that have been tendered to the defense as soon as the prosecution has such knowledge. (See *People v. Gomez* (1984), 127 Ill. App. 3d 551.) The record here is clear that the State's Attorney knew about the discrepancy and made no attempt whatsoever to disclose it to defense counsel or the court.

Although we do not condone the inaction of the State in failing to divulge this information to defense counsel, we nevertheless conclude that the defendants here did not suffer sufficient prejudice as a result of the State's misconduct so as to justify reversal. The failure to comply with discovery requirements does not in all instances necessitate a new trial. (*People v. Greer* (1980), 79 Ill. 2d 103, 120.) A new trial should only be granted if the defendant is prejudiced by the discovery violation and

the trial court failed to eliminate the prejudice. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 172.) Among the factors to be considered in determining whether a new trial is warranted are the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose. *People v. Weaver* (1982), 92 Ill. 2d 545, 559.

We find no error here because our review of the record reveals that the defendants were given the opportunity to extensively cross-examine Johnson, and as a result cast severe doubt on Johnson's credibility as a witness in this case. During cross-examination defense counsel twice proved a 1976 juvenile delinquency adjudication for armed robbery as well as an escape from a juvenile institution. Johnson also admitted his prior criminal conviction for armed robbery and attempted rape. Defense counsel then elicited the admission that Johnson had traded his cooperation in this case for a transfer to the Sheridan Correctional Facility. Regarding the murder of George Bailey, defense counsel questioned Johnson closely concerning specific times and details, suggested physical impossibilities, and generally probed the witness' memory. Defense counsel proved the witness had concealed his gang affiliation in the past and that the witness, after terminating gang membership, did not provide information regarding George Bailey's death to prison officials for some time. Johnson's testimony was further discredited by Investigator McWilliams, who substantially reaffirmed the contents of his written summary detailing the conversation he had had with Johnson in March of 1983 concerning Bailey's death. Clearly when Johnson testified in a manner contradicting the disclosed summary and defense counsel was able to emphasize the inconsistency through McWilliams' trial testimony, the evidence of the discrepancy was more harmful

to the State. Defense counsel ably used this discrepancy to impeach Johnson by showing that he had changed his story since giving his initial statement to the authorities. Thus, in light of the fact that defense counsel was allowed to impeach Johnson with his prior inconsistent statement, we do not find that defense counsel could have used this information any more effectively even if he had been warned prior to trial. (See *People v. Cisewski* (1987), 118 Ill. 2d 163, 173; *People v. Simmons* (1985), 138 Ill. App. 3d 492, 497.) Finally, there is no showing of bad faith or willful concealment of the inconsistent account on the part of the prosecution. Under these circumstances, we find no reversible error in the trial court's denial of the defendants' motion for a mistrial.

Next defendants Harris and Wilson argue that the trial court committed reversible error in denying their pretrial motion for a continuance. The defendants maintain that in light of the voluminous discovery material that was tendered to defense counsel shortly before the trial was to begin, defense counsel did not have an adequate amount of time to prepare for trial.

Defense counsel filed their motion for a continuance on April 8, 1983. In that motion counsel requested an additional 60 days to prepare for trial, which at that time was set for May 16, 1983. The basis for the motion was that approximately one month earlier the defense had been served voluminous discovery materials which counsel had not had an adequate opportunity to study. In ruling on the motion, the trial judge reviewed the chronology of the case. Considering that the case dated back to July 1981, and that a prior continuance was granted in December of 1982, at which time the final trial date of May 16, 1983, was set, the trial court denied the defendants' motion.

The granting or denial of a motion for a continuance to prepare for trial is a matter resting within the sound discretion of the trial court and its decision will not be reversed on appeal unless the record demonstrates an abuse of this discretion. (*People v. Williams* (1982), 92 Ill. 2d 109, 116-18; *People v. Hayes* (1972), 52 Ill. 2d 170, 175.) In making this determination, the trial judge may review the history of the case. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 819), and consider the diligence shown by the moving party (Ill. Rev. Stat. 1985, ch. 38, par. 114—4(e)). The denial of a motion for a continuance does not constitute error unless it appears that the refusal has prejudiced the defendant in the preparation of his defense. *People v. Canaday* (1971), 49 Ill. 2d 416, 427; *People v. Griffiths* (1983), 112 Ill. App. 3d 322, 329.

After reviewing the record before us in its entirety, we are unable to say that the trial court abused its discretion in denying the defendants' motion for a continuance. At the time of the request for a continuance, the defendants had been in custody for the murder of George Bailey for almost two years, and each defendant had been represented by counsel throughout. Approximately 21 months had elapsed from the time of counsel's appointment until the time for trial. When the defendants began receiving the additional discovery material on February 10, 1983, there were still approximately 10 to 12 weeks until the May 16, 1983, trial date. Once that date arrived, 3½ more weeks elapsed before any evidence was actually presented. In all the defendants had over three months from the time they began receiving the supplemental discovery on February 10, 1983, until the trial on May 16, 1983, in which to review the material. Under these circumstances, the defendants had more than ample time to review the supplementary discovery. (See *People v. Guyon* (1981), 101 Ill. App. 3d

799, 801.) Clearly, these defendants' rights were not seriously prejudiced by the trial court's denial of a continuance.

Next defendant Harris argues that he was denied effective assistance of counsel. Specifically the defendant maintains that his trial counsel erred by (1) inadequately handling the situation concerning juror Nilo; (2) inadequately cross-examining key prosecution witnesses; and (3) presenting an inadequate closing argument. In deciding this issue we note that each of these defendants was individually represented.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the United States Supreme Court adopted a two-part test for adjudicating effective assistance of counsel claims. To establish ineffectiveness under the *Strickland* test a defendant must show (1) that counsel's performance was seriously deficient so as to fall below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. (466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064-65.) A defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) A defendant must also overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that the challenged action might have been nothing more than part of counsel's sound trial strategy. (466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) The *Strickland* Court stated that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchal-

lengeable." (466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) As a reviewing court we must evaluate the reasonableness of trial counsel's actions from trial counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances. 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

In the instant case we are unable to conclude that counsel's performance failed to meet reasonable professional standards. Even were we to so conclude, we find that any defects in counsel's performance were not so severe as to demonstrate a reasonable probability of a different result absent the defects.

First, we do not find that counsel's handling of the Nilo situation was prejudicial to defendant Harris. Following the trial court's denial of the defendants' motion for a mistrial, counsel for Harris requested that the jurors be questioned as to whether Nilo had related to them her earlier conversation with her brother-in-law. By making this motion, defense counsel clearly furthered the defendant's position. Such conduct was clearly within the wide range of reasonable professional assistance.

The second area of alleged incompetency involves the scope of defense counsel's cross-examination of State witnesses Rodriguez, Bates and Johnson. In considering the defendant's argument here we note that our evaluation of counsel's conduct cannot properly extend into areas involving the exercise of professional judgment, discretion or trial tactics. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 12.) The record establishes that at the opening of the trial the judge emphatically instructed defense counsel to maintain the order of counsel's admonitions throughout the course of the trial in order to avoid undue confusion and to keep an orderly trial process. Defense counsel for defendant Harris was third in order of cross-examination. Obviously, by the time Harris' counsel was to have cross-examined each of these three wit-

nesses, the relevant area of cross-examination would most likely have been covered. Repetitious cross-examination would have unfairly emphasized the defendants' position and unduly hampered the trial. The record shows that counsel for Harris cross-examined these witnesses on additional points pertaining to Harris or on issues not previously covered by defense counsel for Wilson and Collins. Harris' allegations of incompetency with regards to his counsel's cross-examination of these key prosecution witnesses are directed at questions of trial strategy, the exercise of professional judgment, and matters within trial counsel's discretion, which are all clearly inappropriate for review by this court. (*People v. Greer* (1980), 79 Ill. 2d 103, 122; *People v. Sowinski* (1986), 148 Ill. App. 3d 231, 246.) Defendant Harris has failed to show substantial prejudice, and in the absence of such a showing, we refuse to second-guess trial counsel's decisions regarding the scope and extent of cross-examination of these witnesses. We find from our review of the record here that defense counsel acted ably under the circumstances.

The defendant's attack upon counsel's closing argument as a basis for ineffective assistance of counsel must likewise fail. It is questionable what benefit would have been gained had counsel presented for the third time a complete recitation of the evidence at trial and how it pertained to defendant Harris. It is quite clear from the record that the defendants' strongest attack on ·the State's case was the insufficiency of the evidence and the lack of credible witnesses. Counsel for each defendant succinctly imparted this to the jury. Harris' counsel concisely brought forth during his closing argument the key points of his defense strategy to impeach the credibility of the State's witnesses. He accordingly argued that the People failed to prove their case beyond a reasonable doubt. The fact that the jury did not accept

Harris' position does not mean that his counsel was ineffective. Thus, the defendant's third claim of ineffectiveness must also fail.

In short, defendant Harris has not shown that his trial counsel was incompetent. The allegations of ineffectiveness of counsel, whether considered separately or cumulatively, do not demonstrate any incompetency on the part of Harris' attorney. Defense counsel provided Harris with an adequate defense, and nothing he did resulted in prejudice to the defendant or would have changed the outcome of the trial.

Next, we consider defendant Wilson's argument that the trial court erred in denying his motion for severance.

Prior to trial, Wilson moved to sever his case from that of his codefendants Harris and Collins. An allegation of antagonistic defenses formed the sole basis for the motion. According to Wilson's lawyer, Wilson never gave the murder command, and Harris and Collins, if called to testify, would provide this evidence. However, when pressed to support his motion, counsel admitted he could not "assume" Collins and Harris would agree to testify, and he could not specifically indicate the nature of their anticipated testimony. Counsel for defendant Harris then stated that he would advise his client to assert his fifth amendment privilege. The trial judge noted that if all defendants agreed the murder command was never given, there were no antagonistic defenses. The motion for severance was accordingly denied.

It is well established in Illinois that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (Ill. Rev. Stat. 1985, ch. 38, par. 114—8; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) A defendant's motion for severance must specifically demonstrate how the defendant is going to be prejudiced by proceeding with a joint trial. Mere apprehensions of prejudice are

insufficient. (*People v. Lee* (1981), 87 Ill. 2d 182, 186.) Separate trials are mandated only when the defenses are so antagonistic that a fair trial can be achieved only through severance. (*People v. Sanchez* (1982), 110 Ill. App. 3d 893, 904.) The decision to grant or deny a severance is within the sound discretion of the trial court, and will not be reversed absent an abuse of discretion. *People v. Daugherty* (1984), 102 Ill. 2d 533, 541.

We find here that defendant Wilson's severance motion failed to demonstrate how the defendant would have been prejudiced by proceeding with a joint trial. Although asserting in his motion that his defense was antagonistic to that put forth by Harris and Collins, Harris failed to support his assertion with any facts. This is clearly not a situation like that in *People v. Daugherty* (1984), 102 Ill. 2d 533, cited by the defendant, where each codefendant made statements implicating the other defendant but professing his own innocence. Wilson's claim of antagonism here is merely gratuitous. (See *People v. Gendron* (1968), 41 Ill. 2d 351.) Under these circumstances we find that the trial court did not abuse its discretion in denying defendant Wilson's motion to sever.

Defendant Wilson also contends that severance was warranted here because the government's conspiracy evidence resulted in the denial of his right to confront adverse witnesses. More specifically the defendant argues that the introduction of three out-of-court declarations made by his codefendants as testified to at trial by State witnesses Bates and Johnson rendered erroneous the trial court's denial of his severance motion.

We have examined the record here and find that the defendant has waived this issue for purposes of review. No objection was made to the admission of this testimony at trial, and defendant's mere assertion in his post-trial motion that he was prejudiced by the trial

court's denial of his motion to sever, without identifying any hearsay or confrontation claim as a result of the introduction of these three out-of-court declarations, was insufficient to preserve this issue for purposes of review. (See *People v. Irwin* (1965), 32 Ill. 2d 441, 443-44.) Furthermore, we do not believe that the evidence was so closely balanced as to mandate consideration of this issue under the plain error exception set forth in Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)).

Lastly, we consider defendant Wilson's argument that the trial court erred in failing to conduct a hearing into the attentiveness of juror Betty Strong, who expressed second thoughts about her verdict. The record discloses that after the guilty verdicts were received in open court, but before the death penalty stage of the trial, juror Strong asked to speak with the court. In an *in camera* interview, Strong said she may have missed some of the evidence and now questioned her guilty verdict. The trial judge then excused the juror from chambers, commented to counsel that he may have noticed her "nodding" once, but refused to grant defendant's motion for a mistrial on that basis. In his view her post-verdict regret was the only genuine issue. The trial judge stated, "I perceive this is just a juror who is thinking over what she did."

In his motion for a mistrial, counsel asked the trial court to conduct an additional *voir dire* examination of Strong, and the other jurors as well, to explore the mental processes reflected in their verdict. Counsel wished to determine the weight accorded the evidence, and to discover whether Strong and the other jurors had second thoughts or retrospective misgivings. Counsel did not challenge Strong's ability to serve as a juror nor did he allege any type of juror incapacity generally.

We find that the trial judge did not err in refusing to grant a mistrial on the ground that he may have noticed Betty Strong nodding once during trial. The trial court

was in a position to observe the juror during trial and during its *in camera* interview, and to assess the gravity of her post-verdict misgivings. We find no abuse of the court's discretion in its conduct of the *in camera* interview or in its determination to deny the defendant's motion for a mistrial on this basis. See *People v. Silagy* (1984), 101 Ill. 2d 147.

Although Wilson complains on appeal that the trial court erred in not conducting a more thorough inquiry into the question of juror Strong's attentiveness during the guilt phase of the proceedings, we note that this specific objection was not properly preserved for review by raising it at trial and in the defendant's post-trial motion. This court has previously stated that if a defendant or his attorney sees a juror sleeping, there is a duty to call it to the attention of the court at that time, and the failure to do so results in a waiver of that point. (*People v. Silagy* (1984), 101 Ill. 2d 147, 171.) Accordingly, the issue of the court's failure to conduct a further hearing has been waived.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court affirmed.*