NOTICE
Decision filed 06/16/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230643-U

NO. 5-23-0643

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Edgar County. |
| | ) | |
| v. | ) | No. 16-CF-257 |
| | ) | |
| TIMOTHY J. McNULTY, | ) | Honorable |
| | ) | Matthew L. Sullivan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.[*]

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in prohibiting the defendant from presenting evidence regarding an unsigned love letter that was collateral to the issues in the case and in admitting evidence of an uncharged sexual assault incident purportedly committed by the defendant against the victim following the charged conduct.

¶ 2    Following a jury trial, the defendant, Timothy J. McNulty, was convicted of two counts of predatory criminal sexual assault of a child and one count of criminal sexual assault. Thereafter, the circuit court of Edgar County sentenced him to 16 years in prison for each predatory criminal sexual assault conviction, to run consecutively, and 8 years in prison on the criminal sexual assault conviction, to be served concurrently with the second count of predatory criminal sexual assault.

---

[*]Justice Moore was originally assigned to the panel prior to his retirement. Justice Bollinger was later substituted on the panel and has read the briefs and listened to the oral arguments.

1

On appeal, the defendant contends that the trial court abused its discretion in (1) granting the State's motion *in limine* regarding evidence about an unsigned love letter, found by a testifying witness, which was initially suspected to have been written by the defendant and (2) denying the defendant's motion *in limine* seeking to exclude testimony regarding a specific instance of an uncharged sexual assault allegedly committed by the defendant. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     On December 6, 2016, the defendant was charged with two counts of criminal sexual assault (720 ILCS 5/11-1.20 (a)(2), (a)(3) (West 2014)), one count of aggravated criminal sexual abuse (*id.* § 11-1.60(b)), and one count of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)). The victim was Abigail B., the defendant's stepdaughter at the time. On July 26, 2018, the defendant filed a motion *in limine* seeking to bar any evidence of uncharged sexual conduct that was purportedly committed by him against Abigail in a hotel in Springfield, Illinois. The defendant argued that Edgar County had no jurisdiction over any alleged crimes committed in Sangamon County, and any evidence that this incident happened was irrelevant, inadmissible, and highly prejudicial.

¶ 5     On April 12, 2023, the defendant filed a motion for admission of an expert witness on handwriting analysis. In the motion, the defendant noted that part of the State's evidence was an unsigned, handwritten letter dated November 10, 2011, that described a secret romance. The letter stated as follows:

> "I am so frustrated today. I tried calling, you didn't answer. I'm tired of it.
>
> Whoever it is, is just try[ing] to get you to show your cards and you are. I have been with
>
> 2 for so long that it is driving me crazy. I just want to be with 1 that makes me happy,

2

content, [appreciated], safe and loved. And you are that my soul mate, you complete me in so many ways.

Trust me you are the one and only I cannot stop loving you, but I can try to stop hurting. So when you really believe that I am yours 200% you know how to reach me. I will not let you risk your family. I love you [too] much for that. When you don't feel like I am lying to you, I'll be here.

Love you always and forever,"[1]

¶ 6    In the motion, the defendant indicated that Abigail and Kodey B., Abigail's sister, told Sergeant Adam Rhoads of the Edgar County Sheriff's Office that the handwriting looked similar to the defendant's handwriting. The defendant also indicated that his then-wife, Jami McNulty, stated that the handwriting " 'positively' " looked like his handwriting and that the words and phrases used in the letter were similar to what he had written in the past. However, the defendant denied writing the letter, claiming that it was fabricated by an unidentified person to make him look guilty. The defendant indicated that his retained handwriting expert compared the letter with his handwriting and confirmed that there were differences that pointed to another person, not the defendant, as being the writer. Thus, the defendant sought admission of the expert's testimony at trial.

¶ 7    On April 14, 2023, the State filed an amended information, and then a second amended information on April 17, 2023. On April 21, 2023, the trial court held a pretrial hearing. During the hearing, the State argued that the evidence of the uncharged Springfield incident was admissible to demonstrate a common scheme or plan. The State argued that the incident was

---

[1] The letter was not attached to the defendant's motion for admission of an expert witness, but it was included in the record on appeal as part of a subsequently filed posttrial motion.

proximate in time to the incidents being charged in the present case, that it involved the same victim, and that it involved the same pattern of isolating Abigail from other individuals and of sexual penetration. Given those similarities, the State contended that the uncharged incident was admissible to demonstrate an ongoing pattern of behavior that was linked to a common scheme or plan regarding Abigail. In response, the defendant argued that since the uncharged incident involved the same alleged victim, the evidence was more prejudicial than probative. However, the trial court disagreed with the defense and announced that it was denying the defendant's motion *in limine* with regard to this incident.

¶ 8     On April 25, 2023, the defendant filed a second supplemental motion for discovery, in which he again addressed the letter from the unknown author. In the motion, the defendant maintained that the letter was part of an attempt to frame him by suggesting that he wrote the letter to Abigail. He also maintained that the letter's discovery was not fortuitous but rather a calculated attempt to manufacture evidence that made him look guilty. Thus, the defendant sought discovery related to the origin and discovery of the letter and asked for a handwriting sample of the "supposed true author" who was discovered six years after the letter was found.

¶ 9     On April 27, 2023, the State filed a motion *in limine* seeking to bar any evidence of the unsigned letter. The State indicated that the letter was discovered inside the pocket of a coat worn by Abigail and that the defendant's retained expert had opined that the letter was not written by any of the involved individuals. The State also noted that on April 20, 2023, Abigail's former neighbor, Christina Waltz, contacted Detective Jacob Jenkins of the Edgar County Sheriff's Office and explained that she believed that she was the letter's author and that it was unrelated to this case. Waltz believed that the letter was placed inside a coat that Abigail later borrowed. The State contended that the letter was therefore not relevant and should be deemed inadmissible.

4

¶ 10    On April 28, 2023, the defendant filed a response to the State's motion *in limine*, arguing that even though he was not the letter's author, it was still relevant, as it showed a plot or efforts by Abigail and others to frame him. The defendant noted that Kodey had claimed that she and her grandmother, Vickie Hollingsworth, had found the letter in the coat's pocket the day before Kodey's interview with Sergeant Rhoads and that the coat had been given to Abigail by Waltz. However, Hollingsworth had claimed that she found the letter in a jacket belonging to Jami's boyfriend, that Kodey was present at the time, and that Kodey took the letter. The defendant also noted that according to Detective Jenkins's report, Waltz had reviewed the letter on April 19, 2023, but did not recognize it. However, the following day, Waltz told Detective Jenkins that she was " 'pretty sure' " that she was the letter's author and that the letter was directed to a friend. Waltz did not know how the letter ultimately ended up in the coat or why the coat was in Abigail's possession.

¶ 11    On May 2, 2023, the trial court held a pretrial hearing, at which the parties addressed the State's motion *in limine* regarding the unsigned letter. At the hearing, the trial court questioned the relevancy of the letter by stating as follows: "What is an unsigned letter that doesn't make any reference one way or another and if the State had been asking to get it in, I'm not sure how it could possibly come in." Defense counsel responded that the letter was relevant because the circumstances surrounding the letter's discovery, the comments made about the letter's author likely being the defendant, and then the subsequent discovery of the author demonstrated a plan to frame the defendant. Counsel also argued that the evidence was admissible to question the credibility of Kodey, the only eyewitness in the case, as well as Abigail. The trial court responded as follows:

"So you're saying that the defendant, the way adult male to a 14 year old girl would have been saying, allegedly in this loaded letter, 'I'm tired of it. Whoever it is, is just trying to get you to show *** your cards and you are. I have been with two for so long that it is driving me crazy. I just want to be with one that makes me happy, content, appreciated, safe, and loved. And you are that, my soul mate. You complete me in so many ways.'

So just explain to me what that could possibly mean. We should come out into the open, you're 14 years old, it's time for us to stop hiding in the shadows."

¶ 12 The trial court then noted that the letter made no sense in the context of this case. Defense counsel agreed, noting that the letter did not have any similarity to the present allegations. However, counsel argued that even though the letter did not make any sense, that did not mean it was not fabricated and that it was not relevant to the question of reasonable doubt. The trial court then noted that the defense's handwriting expert had concluded that the letter was not written by Kodey or Abigail, and that if the State had attempted to introduce the letter, it would be "ludicrous." The trial court indicated that there was absolutely no reference in the letter to the defendant, to Abigail, or to anyone who lived in that household and that the trial would not become a "sideshow" involving the letter. Thus, the trial court found that the letter was not admissible, as it was not relevant.

¶ 13 Later during the hearing, defense counsel asked permission to obtain a sample of Waltz's handwriting, noting that if it was determined that Waltz had not written the letter, the trial court might reconsider whether the letter was relevant. The trial court asked what Waltz's motive would be for lying about being the letter's author, and defense counsel responded that Waltz was the former neighbor of Jami and Hollingsworth. The trial court then asked how the letter's contents pointed to the defendant. Defense counsel responded that in Abigail's police interview, she

6

indicated that the defendant never physically threatened her, but he did threaten that if she told anyone about what had happened, it would destroy the family. Defense counsel argued that these allegations were similar to the "theme in [the] letter."

¶ 14 The trial court again discussed the letter's contents, noting that the letter made no sense in the context of this case, *i.e.*, an adult male having sex with his 14-year-old stepdaughter, who lived with him. Defense counsel responded that he agreed that the letter's contents were ridiculous but argued that if Kodey had thought the letter was irrelevant, she would not have turned it into the police. Defense counsel also agreed that the letter was laughable as an attempt to frame the defendant but noted that "lots of people make inept efforts to frame people." The trial court then noted that the defendant's name was not even on the letter and questioned why the court would allow either side to "go down this rabbit hole of totally extraneous things" when the defendant was not the letter's author. The trial court also noted the defense's expert had already determined that neither Abigail nor Kodey had authored the letter. Thus, the trial court denied the defendant's request for Waltz's handwriting sample.

¶ 15 On May 5, 2023, the trial court held another pretrial hearing, at which defense counsel requested a limiting instruction that instructed the jury as to the purpose for which it could consider the evidence related to the uncharged incident. The proposed instruction was based on Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000). The State argued that the evidence was admissible to demonstrate both the defendant's intent and to show the same course of conduct in that the defendant isolated Abigail in order to commit the various sexual acts. The trial court found that a limiting instruction would be given, but it would only refer to the evidence being used to show the defendant's intent, not a course of conduct.

7

¶ 16    On May 9, 2023, the State filed a fourth amended information, alleging that the defendant committed two counts of predatory criminal sexual assault of a child who was under 13 years old (720 ILCS 5/11-1.40(a)(1) (West 2022)). Specifically, the State alleged that the defendant inserted a tampon into Abigail's vagina during the spring or summer of 2009 and his penis into Abigail's vagina during the fall or winter of 2009. The State also alleged that the defendant committed one count of criminal sexual assault for inserting his penis into Abigail's vagina during the spring or summer of 2011 (*id.* § 11-1.20(a)(3)).

¶ 17    Also on May 9, the jury trial commenced, and the following testimony was presented. Abigail testified that she was born on September 24, 1997; she had three sisters; and she was the oldest of her siblings. Jami, Abigail's mother, married the defendant in August 2005 which was around the time that he moved into Jami's home with his two sons. In the spring of 2009, when Abigail was 11 years old, she had her first period while at school. She told the school nurse, the nurse called Abigail's home to request that someone bring Abigail a change of clothing, and the defendant brought her clothes to school. After school, she and Kodey rode the bus home. The defendant was the school bus driver. Abigail explained that she and her sister would ride the bus with the defendant until he completed his route, and then he would take them home. That day, before going home, the defendant stopped at Dollar General to purchase tampons for Abigail. When they got home, Kodey went inside the house, but the defendant took Abigail out to the camper parked in their driveway. While inside, the defendant placed a towel on the bed and directed Abigail to remove her pants and underwear and to lay on the towel. He then inserted a tampon into her vagina. They were alone in the camper at the time. Abigail explained that she knew that the defendant's actions were wrong, but she did not know how to get out of the situation. The defendant told her not to say anything about the incident because it could ruin the family.

8

¶ 18    Following the tampon incident, Abigail had several inappropriate interactions with the defendant where she believed that he was grooming her. On several occasions, he walked in on her while she was taking a bath and locked the door. While in the bathroom, he shaved her pubic area, fondled her breasts, and/or made her kiss him on the lips. He also touched her private areas, both over and under her clothing, and had her touch him. He isolated her from her family by making her go with him on various errands while her sisters spent time with their mother or other family members.

¶ 19    Abigail described another incident that occurred at the end of November 2009 when she was 12 years old. During this incident, the defendant picked her up from volleyball practice and took her to a residence that he owned. While inside, he led her into a room, pulled down her pants, and started touching her breasts over her shirt. He then unbuckled his belt, pulled his pants and underwear down, pushed her over the arm of the couch, and inserted his penis into her vagina. She started crying because it was painful, and she told him that it hurt. He continued for a few seconds longer and then stopped and walked out of the room. While they were walking back toward his vehicle, he again told her not to say anything about the incident.

¶ 20    Abigail testified that similar sexual assault incidents occurred multiple times following the November 2009 interaction. Specifically, she noted that another incident occurred in the spring or summer of 2011, when she was 13 years old. She explained that the defendant had other jobs in addition to being a school bus driver; one such job was cleaning and doing maintenance at some local churches. Abigail was assisting the defendant with cleaning one of the churches when he asked her to retrieve an item from the utility closet located in the church's recently built addition. The defendant entered the closet behind her, and when she bent down to pick the item off the ground, he put his hand on her back to keep her in that position. He then pulled down both of their

9

pants and inserted his penis into her vagina. She believed that they were alone in the church at the time.

¶ 21  Abigail noted that the last time that the defendant sexually assaulted her was in August 2013 and this incident occurred at the Crown Plaza Hotel in Springfield. She was exhibiting a woodworking project at the state fair, and the defendant went with her. While inside the hotel's elevator, he started kissing her, but she pushed him off her and asked what he was doing. He responded that no one there knew how old she was. They then entered their hotel room, which had only one bed, and the defendant had a cooler containing champagne and strawberries. She went to the bathroom, and when she came out, he had poured her a glass of champagne. He then undressed her and sexually assaulted her.

¶ 22  Before 2009, Abigail had never seen a penis. She did not believe that anyone had witnessed the incidents with the defendant. She never said anything about what was happening because she was embarrassed; and she knew that if it was happening to her, then it was not happening to her sisters.

¶ 23  On cross-examination, Abigail testified that she did not see anyone present during the tampon incident, and there were no eyewitnesses for the other incidents. She was not aware that there were no records showing that she was at the Crown Plaza Hotel at the time she specified. She could not remember whether she told her mother about the tampon incident, but she did not tell her mother about the other incidents. She did not remember whether she told Sergeant Rhoads about the defendant shaving her pubic hair or whether she mentioned the incident during her 2021 deposition in the divorce case between her mother and the defendant. She acknowledged telling Sergeant Rhoads that the incident at the defendant's property happened when she was 13 years old, not 12 years old. At the time, she was not aware that the charge against the defendant was

more serious if the defendant committed the offense when she was 12 years old. She could not remember exactly when the incident occurred, but she knew it was either the end of November 2009 or the beginning of December 2009. She also could not remember exactly when the incident at the church occurred, except that it was after the addition was finished at the church.

¶ 24 Abigail further testified that Jami and the defendant had a daughter, Kristin, and Kristin was two years old when Jami and the defendant separated in 2013. When Jami and the defendant separated, they agreed that Kristin would spend every other day with each parent. This arrangement continued until the defendant was arrested on the charges related to Abigail's sexual assault allegations. Abigail believed that the custody arrangement was not desirable because it did not provide Kristin with stability. Sometime in 2016, Abigail spoke with a counselor about the defendant sexually assaulting her, and this was the first time that she told anyone about what had occurred. Abigail explained that Kristin was almost 11 years old, which was the age she was when the defendant started sexually assaulting her, so she came forward to protect Kristin. She knew that revealing what the defendant had done to her would result in her mother getting full custody of Kristin. However, on redirect examination, Abigail testified that she did not make up the allegations so that her mother could have full custody of Kristin.

¶ 25 Tom Hebermehl, a member of the church where the utility closet incident occurred, testified that the church's addition was completed in 2010. Thereafter, Kodey testified that she had witnessed the 2009 tampon incident. However, she recalled that the incident occurred in the defendant's bedroom and in the summer. She recalled that Abigail was lying on the bed and was not wearing pants, and the defendant was standing next to the bed with the tampon applicator in his hand. She believed that she later mentioned the incident to her mother, but she could not remember her mother's response. She also witnessed an incident in 2011 when she entered the

11

camper and observed Abigail lying on the bed, and the defendant standing beside the bed. At the time, Abigail was naked, and the defendant was pulling up his pants.

¶ 26    On cross-examination, Kodey maintained that she did not believe that the tampon incident that she observed occurred in the camper. She could not remember whether Abigail or the defendant said anything to her at the time, but she did not ask Abigail about the incident later. She told her mother about the tampon incident but did not remember if her mother talked with Abigail about it. She did not remember when the 2011 incident occurred, but she believed it happened in the summer. Although she did not say anything to Abigail or the defendant at the time, she asked Abigail about the incident later. In response, Abigail started crying and asked to change the subject. Kodey acknowledged that, in her deposition in the divorce case, she might have testified that the defendant yelled at her to get out when she was in the camper. Kodey could not remember if she told her mother about witnessing this incident, and if she did, how her mother responded. However, she acknowledged that she might have previously said that she told her mother about the incident, and her mother responded that she was just mad because the defendant loved Abigail more. Kodey did not recall whether she had discussed the custody schedule for Kristin with Abigail, but she admitted that she was not satisfied with the arrangement because she did not see Kristin as often.

¶ 27    Sergeant Rhoads testified that he participated in the investigation in this case. On November 2, 2016, Trevor Kendrick, a counselor at Rock Counseling Group in Urbana, reported Abigail's allegations against the defendant. Kendrick reported that she had a client that had disclosed past sexual abuse, and since Kendrick was a mandated reporter, she called the sheriff's office to report the abuse. Sergeant Rhoads then spoke with Abigail about the report, but Abigail was uncomfortable speaking about the abuse because she was concerned about her youngest sibling's wellbeing. Approximately 20 days later, Abigail contacted Sergeant Rhoads and

12

indicated that she wished to file a report. On either November 22 or 23, he then spoke with Abigail about the allegations. He also spoke with Kodey, Jami, Abigail's aunt, and Abigail's half-sister. He also visited the church where the incident occurred in the basement utility closet. He noted that Abigail had described the layout of the church's basement. The State rested its case.

¶ 28    Defense counsel then presented the following testimony. Sergeant Rhoads testified that when he interviewed Abigail about the church incident, she claimed she was 13 years old. He acknowledged that when he interviewed Kodey, she indicated that the tampon incident occurred in the house. However, he noted that Abigail had told him that there was more than one tampon incident.

¶ 29    Joseph McNulty, the defendant's son, testified that he lived in the same house as Abigail for approximately six years; he lived there until January 2011. Joseph believed that Abigail and the defendant had a normal stepdaughter-stepfather relationship. Joseph noted that during the time that he lived with Abigail, Abigail was not reclusive or standoffish to him or to the rest of the family, which included the defendant. Joseph never witnessed anything to make him believe that the defendant was isolating Abigail from the rest of the family or that the defendant was giving Abigail more attention than the other children. He also did not observe any changes in Abigail's behavior or the defendant's behavior between 2008 and the end of 2010. He noted that 2009 seemed like a normal year. On cross-examination, Joseph indicated that he was a junior in high school in 2009, he had gotten his driver's license in 2008, and he was involved in sports. He agreed that there were significant amounts of time that he was not in the same place as the defendant or Abigail.

¶ 30    Abigail was recalled as a witness and testified that the defendant inserted a tampon into her vagina on more than one occasion. However, she acknowledged that in her previous deposition,

13

she indicated that the defendant only inserted a tampon in her vagina one time. On cross-examination, Abigail noted that there were eight years between the time that she was last sexually assaulted by the defendant and her deposition. She also indicated that the defendant sexually assaulted her multiple times and that it was difficult to remember every single time.

¶ 31    Jami testified that the defendant had not seen Kristin for approximately six and a half years because of the accusations that were made against him. Jami indicated that in May of Abigail's fifth grade year, Abigail had her first period. Jami learned about Abigail's period because the school called Jami, and Jami went there to assist Abigail. She did not believe that she took Abigail home from school that day. However, she acknowledged that in her 2021 deposition, she indicated that she was pretty sure she had taken Abigail home when Abigail got her period, so Abigail could change her clothing. She did not recall being told that the defendant had taken Abigail to buy tampons or discussing the tampon incident with him. She claimed that neither Abigail nor Kodey told her about the tampon incident.

¶ 32    On cross-examination, Jami admitted that during her April 24, 2023, interview with Detective Jenkins, she could not remember whether she had taken Abigail home from school or just brought Abigail a change of clothing to school. She mentioned the tampon incident during her November 28, 2016, interview with Sergeant Rhoads. At that time, she said that she believed that the defendant had just explained to Abigail how to insert a tampon, but she thought it was "weird." Also during that interview, she explained that she learned about the tampon incident when one of the girls told her, but she did not know that the defendant had actually inserted the tampon into Abigail's vagina. On redirect examination, Jami noted that Kodey told her about the tampon incident around the time of the defendant's arrest. On recross examination, Jami denied telling

14

Abigail to fabricate the sexual assault allegations against the defendant so that Jami could obtain full custody of Kristin.

¶ 33 Jeanette Levelle, an administrative assistant at one of the local churches, testified that she started working at the church in June 2015 and had worked there with the defendant for one and a half years until he was arrested. In the summer of 2016, while at the church, she briefly observed the defendant's stepdaughters sitting on the floor with the defendant and visiting with him. The girls seemed happy to see the defendant, appeared very comfortable with him, and were laughing and talking with him. Levelle did not notice any discomfort between the defendant and his stepdaughters. On cross-examination, Levelle indicated that she did not know that the defendant had three stepdaughters. Levelle believed that Abigail was one of the stepdaughters there that day, but she could not recall whether she knew that at the time or was told after the interaction. She only observed the interaction for approximately one minute. The defense then rested.

¶ 34 Following closing arguments, the trial court read the jury instructions, which included the following instruction regarding evidence of the defendant's uncharged conduct:

"Evidence has been received that the defendant has been involved in an offense other than those charged in the Information.

This evidence has been received on the issue of the defendant's intent and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of intent."

¶ 35 After jury deliberations, the jury found the defendant guilty of two counts of predatory criminal sexual assault and one count of criminal sexual assault. Thereafter, on June 8, 2023, the defendant filed a motion for judgment notwithstanding the verdict, arguing, in pertinent part, that

15

the State failed to present any evidence that the defendant's alleged insertion of a tampon into Abigail's vagina constituted sexual penetration for predatory criminal sexual assault.

¶ 36 In addition, on June 9, 2023, the defendant filed a motion for new trial, arguing, in pertinent part, that the trial court erred in barring any evidence about the unsigned letter because the letter was highly relevant to show the plot or efforts made by Abigail and others to frame the defendant. The defendant argued that early in the investigation, the State appeared to believe that the letter was relevant, even though the letter's contents did not match the accusations being made against the defendant. Thus, the defendant argued that the State would have presented the letter as evidence demonstrating the defendant's guilt if the defendant had not produced an expert witness who opined that the defendant was not the letter's author. The defendant argued that the eventual discovery of the author was "merely a salvage operation" and designed to "downplay" any inference that the witnesses had attempted to frame the defendant.

¶ 37 The defendant argued that the trial court's decision prohibiting him from presenting this evidence, which was both material and favorable to him, violated his rights to confront the witnesses against him and to present a defense. The defendant noted that there was no physical evidence that any crime was committed; and the only eyewitness, besides Abigail, to the commission of any sexual offense was the person who discovered the letter. Thus, the defendant argued that it was reasonably possible that the circumstances surrounding the letter could have impacted the case's outcome. Regarding the uncharged sexual conduct, the defendant argued that the State improperly offered this evidence to prove the defendant's bad character, rather than for a permissible purpose. The defendant argued that his intent was not relevant to the charged offenses, but even if it was relevant to the tampon incident, the uncharged conduct was not

16

admissible because that incident occurred years after the tampon incident and was factually dissimilar.

¶ 38　On June 23, 2023, the trial court held a hearing on the defendant's posttrial motions. At the hearing, defense counsel argued that if the other-crimes evidence of the uncharged conduct was properly admitted, it should only have been admitted as evidence to show the defendant's intent with regard to the tampon incident. Defense counsel argued that there was no question of intent as to the other charges and thus the evidence was inadmissible propensity evidence. Counsel acknowledged that the argument was weaker regarding the tampon incident because counsel had argued that this could have been an innocent contact. Counsel also argued that the propensity evidence was highly prejudicial. The State responded that the uncharged conduct was a subsequent act that showed a pattern of behavior against Abigail that continued for a period of years and showed the defendant's intent relating to the tampon incident. Thus, the State argued that intent mattered in this case. Also, the State noted that the jury was provided with an instruction limiting the jury's consideration of the evidence to the defendant's intent. After hearing arguments, the trial court denied the defendant's motions.

¶ 39　On August 4, 2023, the trial court sentenced the defendant to 16 years in prison for each predatory criminal sexual assault conviction, to be served consecutively, and 8 years in prison for the criminal sexual assault conviction, to be served concurrently with the second count of predatory criminal sexual assault. The defendant appeals.

¶ 40　　　　　　　　　　　　　　II. ANALYSIS

¶ 41　The defendant first contends that the trial court abused its discretion in prohibiting the unsigned letter from being admitted into evidence because it prevented him from being able to

17

confront the witnesses against him and to present his defense. The defendant notes that he sought

to use the letter to impeach the credibility of Abigail and Kodey and/or to establish their bias.

¶ 42    Initially, the State contends that the defendant has forfeited this argument on appeal

because the defendant failed to make a formal offer of proof in the trial court identifying what the

testimony would be regarding the letter and/or the conclusions that would have been provided by

the handwriting expert. Alternatively, the State argues that the record is insufficient to resolve the

issue, as the available information concerning the discovery of the letter and the statements made

by the witnesses about the letter came solely from written and oral arguments presented by defense

counsel and the State, as well as the trial court's statements. The State notes that during the trial

court proceedings, there were multiple references to the defendant's handwriting expert's opinions,

police reports, and deposition testimony provided in the civil divorce action between the defendant

and Abigail's mother. However, none of those documents were made part of the record. Noting

that there is no documentary evidence to support defense counsel's argument, the State argues that

we should presume that the trial court's order was in conformity with the law. In response, the

defendant contends that a formal offer of proof was unnecessary, as the record contained written

and oral arguments summarizing the evidence relating to the letter as well as the actual letter at

issue.

¶ 43    To properly preserve an alleged error relating to the exclusion of evidence, an offer of proof

is usually necessary. *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). "The purpose of an offer

of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and

substance of the evidence sought to be introduced." *People v. Leak*, 398 Ill. App. 3d 798, 822

(2010). An offer of proof allows the reviewing court to determine whether the exclusion of the

evidence was proper. *People v. Way*, 2017 IL 120023, ¶ 33. The offer is not required to be a formal

18

recitation of the witness's testimony under oath but may be informal and consist of counsel's representations as to the contents of the testimony. *Id.*

¶ 44 Also, an appellant has the burden to present a sufficiently complete record to support the claim of error. *People v. Ortiz*, 313 Ill. App. 3d 896, 900 (2000). In the absence of such a record, it will be presumed that the trial court's order was in conformity with the law and had a sufficient factual basis. *People v. Sechler*, 262 Ill. App. 3d 226, 227 (1994).

¶ 45 In this case, the issue of whether the unsigned letter should be admitted into evidence was argued at length in the parties' pretrial filings and at the pretrial hearing held on May 2, 2023. Thus, the parties and the trial court were well aware of the letter's contents, what the substance of the testimony about the letter would be, and the handwriting expert's conclusions. Moreover, the record on appeal is sufficient for us to ascertain the nature and substance of the evidence sought to be introduced. An offer of proof is not necessary where it is apparent that the court understood the nature of the objection and character of the evidence sought to be introduced. *Carter v. Azaran*, 332 Ill. App. 3d 948, 956 (2002). Thus, we conclude that making an offer of proof was unnecessary, as the record provides an adequate basis on which to review the trial court's ruling without an offer. In addition, although the transcripts and other documents identified by the State are not contained in the record on appeal, we find that the record is sufficient to review the trial court's ruling on the admissibility of the evidence related to the letter. Therefore, we now turn to the merits of the defendant's argument as to whether the trial court abused its discretion in not allowing the defendant to present this evidence.

¶ 46 The admissibility of evidence is a matter within the sound discretion of the trial court and thus will not be overturned absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364

(1991). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 47   In this case, the defendant sought to introduce evidence relating to the unsigned letter to impeach the credibility of Abigail and Kodey. Alternatively, he sought to introduce the letter to establish their bias against him in that they were prepared to, at the very least, make fanciful allegations about the letter, and, at most, to testify falsely to support Abigail's sexual assault allegations. The defendant also contends that the trial court's error in prohibiting the admission of this evidence was prejudicial where the credibility of both the complaining witness, Abigail, and the only other eyewitness, Kodey, was crucial to the case. In response, the State contends that the letter was collateral to the issues raised at trial and thus was inadmissible to challenge the witnesses' credibility. The State also contends that the letter was not admissible to establish bias, as it did not relate to the issues in the case and would only serve to confuse the jury.

¶ 48   Specific instances of untruthfulness are not admissible to attack a witness's believability. *People v. Morrow*, 303 Ill. App. 3d 671, 680 (1999). Thus, a party may not rely on an inference that because the witness had lied on a previous occasion, the jury would be more likely to believe that the witness was lying in her testimony regarding the facts at issue in the present case. *People v. Santos*, 211 Ill. 2d 395, 405 (2004). Although the defendant in the present case acknowledges that specific-act impeachment is inadmissible to attack a witness's credibility, the defendant nevertheless contends that the letter is admissible because he was not impeaching the witnesses on a collateral matter. "A matter is collateral if it is not relevant to a material issue of the case." *Esser v. McIntyre*, 169 Ill. 2d 292, 305 (1996). The test to determine if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict. *People v. Marshall*, 2025

IL App (4th) 240368, ¶ 58. The exclusion of collateral evidence prevents a jury from becoming distracted from the main issues in the case. *Id.*

¶ 49    Here, the defendant argues that the evidence was not collateral to the issue at trial because the letter was used to support Abigail's sexual assault allegations against him. Thus, the defendant contends that once it was discovered that the defendant was not the author, evidence that Abigail and Kodey had made false statements about him authoring the letter could be used to impeach them about the sexual misconduct allegations. We disagree with the defendant's assertion that the letter was not collateral evidence. First, there was no direct evidence that Abigail or her family lied about or manufactured the letter to be used against the defendant in support of the State's case. In fact, the defendant's expert witness concluded that the letter was not authored by Abigail, Kodey, Jami, or Hollingsworth. Second, there was also no evidence as to what Waltz's motive would be for lying about being the potential author of the letter or evidence establishing the connection that she had to the family, other than being a neighbor. Finally, the letter's contents do not even mention the defendant or reference the charged conduct in this case. Thus, we find that the letter was collateral evidence and, as such, was specific-act evidence that was not admissible to impeach the witnesses' believability.

¶ 50    The defendant next argues that if the letter was not admissible to impeach the witnesses' credibility, then it was admissible to establish their bias. The defendant argues that Abigail and Kodey were motivated to fabricate allegations against him because they wanted their mother to have full custody of their younger sister. The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him to show the witness's bias, interest, or motive for testifying falsely. *People v. Harris*, 123 Ill. 2d 113, 144 (1988). Thus, in general, defense counsel is given wide

latitude in cross-examining the State's witnesses for the purpose of showing bias. *People v. Jones*, 240 Ill. App. 3d 1055, 1060 (1992). However, the sixth amendment does not prevent a trial judge from imposing limits on defense counsel's inquiry into a witness's potential bias. *Harris*, 123 Ill. 2d at 144. The trial judge has wide latitude to impose reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or of little relevance. *Id.* "Thus, the evidence used to establish bias must be timely, unequivocal and directly related, and may not be remote or uncertain." *Leak*, 398 Ill. App. 3d at 822. Also, the evidence must give rise to an inference that the witness has something to gain or lose by her testimony. *Harris*, 123 Ill. 2d at 147. The proper scope of cross-examination rests within the broad discretion of the trial court and is subject to reversal only where there is an abuse of discretion. *Jones*, 240 Ill. App. 3d at 1060.

¶ 51 In determining whether the trial court abused its discretion in preventing a defendant from cross-examining a witness regarding bias, the reviewing court must ask whether the defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony. *Harris*, 123 Ill. 2d at 145. When answering this question, the court should look at the record as a whole and determine whether there was an alternative means to impeach the witness. *Id.*

¶ 52 Here, the letter was not relevant because it made no reference to the allegations that were made against the defendant in this case and thus evidence relating to the letter would only serve to confuse the issues before the jury. In addition, if this evidence had been admitted to show that the letter was fabricated in an attempt to support Abigail's allegations, there is a concern that it could have created a minitrial on an issue that was collateral to the issues in the case. Specifically, to prove the defendant's theory, witnesses would need to testify about the circumstances surrounding

22

the letter, including the letter's discovery; the reason why the letter was turned into the police; and the reasons why the various witnesses believed the defendant had written the letter. Also, the defendant's handwriting expert would need to testify about his conclusions regarding the author. "The confrontation clause guarantees criminal defendants the opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense desires." *People v. Green*, 339 Ill. App. 3d 443, 457 (2003).

¶ 53 Moreover, we note that the exclusion of the letter did not deprive the defendant of an opportunity to question Abigail or Kodey about their potential bias. In fact, during trial, defense counsel questioned Abigail about the timing of the allegations made against the defendant, as well as the fact that the allegations, and the defendant's subsequent arrest, resulted in her mother obtaining full custody of her younger sister. Therefore, considering the letter's lack of relevance, and to avoid confusion of the issues, and to prevent the introduction of evidence on a collateral issue, we find that the trial court did not abuse its discretion in excluding the evidence.

¶ 54 The defendant further argues that the trial court abused its discretion in denying his motion *in limine* seeking to exclude testimony regarding the uncharged conduct that allegedly occurred in Springfield. Evidence of other crimes is generally not admissible to show a defendant's propensity to commit a crime. *People v. Watts*, 2022 IL App (4th) 210590, ¶ 39. However, other-crimes evidence is admissible for any purpose other than to show a defendant's propensity to commit crimes, and such purposes include motive, intent, identity, lack of mistake, and *modus operandi*. *Id.* The other-crimes evidence rules are codified in Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), which states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by [certain statutes]. Such evidence may also be admissible for other purposes, such as proof of motive,

23

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Thus, other-crimes evidence is admissible to show that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). The other-crimes evidence to show defendant's criminal intent encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial. *People v. Jones*, 215 Ill. App. 3d 903, 911 (1991).

¶ 55 However, even when the evidence is offered for a permissible purpose, the other-crimes evidence may be excluded if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365. The determination of whether the other-crimes evidence should be admissible is not dependent on whether the evidence is prejudicial, as the evidence is unquestionably prejudicial to a defendant. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45. Instead, the concern is that the prejudice is undue or unfair, such that it is the type of prejudice that would lure the factfinder into finding a defendant guilty on a different ground than from the specific proof presented on the charged offense. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 66.

¶ 56 The admissibility of other-crimes evidence lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Wilson*, 214 Ill. 2d at 136. As previously noted, an abuse of discretion is found where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *People v. Childress*, 338 Ill. App. 3d 540, 545 (2003).

¶ 57 Here, the trial court admitted the evidence of the uncharged conduct to establish the defendant's intent. However, the defendant argues that where, like here, a defendant has denied committing the charged offense, other-crimes evidence to establish intent should not be admitted.

24

¶ 58    In *People v. Smart*, 2025 IL 130127, ¶ 1, our supreme court analyzed the issue of whether the State may introduce evidence of other misconduct to prove intent when a defendant has denied committing the charged crime and has not presented any evidence or argument that his acts were accidental, incidental, or inadvertent. The supreme court found that evidence of other crimes, wrongs, or acts of misconduct may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but the evidence must be relevant without relying on a propensity inference. *Id.* ¶ 72. Thus, the threshold criteria for admission of evidence under Rule 404(b) is that the relevance of the evidence does not depend on an inference of the defendant's propensity to commit crimes. If the court finds that the evidence is relevant without relying on a propensity inference, the court must then determine whether the prejudicial effect of the evidence substantially outweighs its probative value. *Id.*

¶ 59    Here, the specific evidence at issue was evidence of uncharged allegations that the defendant had purportedly sexually assaulted Abigail in 2013 at a Springfield hotel. This alleged incident occurred after the circumstances surrounding the charged offenses in this case. The evidence about this uncharged incident was relevant to demonstrate the defendant's intent with regard to the previous tampon incident. Although the defendant denied committing the tampon offense, he raised issues concerning his intent when his counsel argued, during closing argument, that placing a tampon inside Abigail was not sexual penetration. Thus, by arguing that the charged incident was not sexual in nature, the subsequent uncharged act was relevant to establish the defendant's intent with regard to the previous charge involving the tampon.

¶ 60    Moreover, we note that an exception to the general bar against other-crimes evidence to show propensity applies in certain sexual crimes, including the charged crimes in this case. Pursuant to section 115-7.3(a), (b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS

25

5/115-7.3(a)(1), (b) (West 2022), certain offenses involving sexual misconduct may be used to show a defendant's propensity to commit another such enumerated sex offense. See *People v. Donoho*, 204 Ill. 2d 159, 176 (2003) (this statute allows courts to admit other-crimes evidence to show the defendant's propensity to commit sex offenses if the requirements of section 115-7.3 of the Code are met). However, before admitting the other-crimes evidence, section 115-7.3 of the Code requires the trial court to consider three factors in balancing the probative and prejudicial value of the evidence: proximity in time, degree of factual similarity, and any other relevant facts and circumstances. 725 ILCS 5/115-7.3(c) (West 2022). Since the defendant committed one of the sexual offenses enumerated in section 115-7.3(a), (b) of the Code (*id*. §§ 115-7.3(a)(1), (b)), it appears that evidence that he committed another such offense would have been admissible for any relevant purpose, including for propensity purposes, after balancing the probative and prejudicial value of the evidence. The trial court was in the best position to weigh the prejudicial impact of this evidence in the context of the entire case, and reviewing the record, we find that the prejudicial effect of this subsequent uncharged assault does not substantially outweigh its probative value. Thus, considering the trial court's decision under the abuse of discretion standard, we conclude that the court did not abuse its discretion in admitting the evidence.

¶ 61    However, even if we find that evidence of the uncharged incident was improperly admitted, the error was harmless given the other evidence that was presented to the jury about the multiple acts of sexual abuse committed by the defendant against Abigail. See *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 24 (where the improper evidence was not a material factor in the defendant's conviction or there is overwhelming evidence of the defendant's guilt, the improper admission of other-crimes evidence is harmless). We also note that the jury was properly instructed that the jury was only to consider the complained of evidence for a limited nonpropensity purpose. Although

26

this guidance does not automatically cure any error, it does limit and substantially reduce any prejudicial effect of the admitted evidence. *Illgen*, 145 Ill. 2d at 376. Accordingly, based on the above, we conclude that the trial court did not abuse its discretion in denying the defendant's motion *in limine* and allowing the State to present evidence regarding this uncharged, subsequent incident.

¶ 62                                    III. CONCLUSION

¶ 63    For the reasons stated, we affirm the judgment of the circuit court of Edgar County.


¶ 64    Affirmed.